## Case No. 2,071.

### BRYDIE v. MILLER et al.

[1 Brock. 147.][1]

Circuit Court, D. Virginia. May Term, 1809.

PARTNERSHIP—DISSOLUTION—SETTLEMENT.

Where a final settlement of the accounts of a mercantile firm has taken place, after its dissolution, shortly after which, one of the partners dies, and a bill is filed by the executor against the surviving partners, to compel a resettlement, the deceased partner being of sound mind, when the settlement was made, and deliberately sanctioning it, a court of equity will not disturb the former settlement, unless it be clearly shown, that errors were committed, or that imposition was practised upon the deceased partner, to induce him to sanction it. But see Dunbar v. Miller [Case No. 4,130].

[In equity. Bill by the executor of Alexander Brydie against Miller, Hart & Co. and William Brown & Co. for a resettlement of partnership accounts. The resettlement was refused, but an account of matters still remaining open was ordered.]

On the 13th day of June, 1796, James R. Miller, Patrick Hart, and William M'Clure, constituting the firm of Miller, Hart & Co., of the city of London, entered into partnership, with Alexander Brydie, of the city of Richmond, Virginia. By the articles of copartnery, it was stipulated, that the new firm should be established in Richmond, and transact business under the style of M'Clure, Brydie & Co.: that the firm should continue four years, from the 1st of September, 1795, the immediate management of its business to be committed to Alexander Brydie, subject to the control and direction of the majority, "in matters controversial, touching the execution of old, or the adoption of new plans, in the course of said business,"—and that the business of the house of M'Clure, Brydie & Co. in Europe, should be done by Miller, Hart & Co., on the same terms on which they had transacted the business of the firm of Alexander Brydie & Co., then lately dissolved. A very active business was carried on, during the existence of the firm of M'Clure, Brydie & Co., and frequent and heavy shipments of tobacco were made to Miller, Hart & Co. in London. The firm expired by limitation, on the 1st of Septem-

[1] [Reported by John W. Brockenbrough, Esq.]

ber, 1799, and a formal settlement of the accounts of M'Clure, Brydie & Co. and Miller, Hart & Co. was entered into, between William M'Clure and Alexander Brydie. Shortly after this settlement, which was sanctioned and approved by Brydie, the said Brydie died, and a bill was filed in 1802, in the court of chancery of the state of Virginia, by his executor, against William Brown & Co. of Virginia, and Miller, Hart & Co. of London, charging numerous and gross errors, to the prejudice of his testator in the account, settled between M'Clure and Brydie. The bill called for a new settlement of the accounts between the two firms, and prayed that the other defendants, William Brown & Co., might be restrained from making any further remittances of the large sums of money, alleged to be in their hands, belonging to Miller, Hart & Co., but that the same might be decreed to be paid to the plaintiff, as executor of Alexander Brydie, whenever the amount still due to the estate of his testator could be ascertained by a re-settlement of accounts.[2] The cause was subsequently removed, by petition of Miller, Hart & Co. to this court,[3] and a very elaborate answer was thereupon filed by them, denying each and all the charges of fraud and misconduct on their part, in the transaction of the business of M'Clure, Brydie & Co., and relying upon the former settlement, approved by Alexander Brydie, in his life time, as a bar to any future investigation of their accounts. The several specifications of the bill, with the answer of Miller, Hart & Co. to each, are stated and commented on, in the following opinion.

MARSHALL, Circuit Justice. The object of this suit is to open an account which was settled between the parties, in the life time of the testator of the plaintiff, and to have a re-settlement of all the transactions of M'Clure, Brydie & Co.

It is the right of every individual to exercise his own judgment on his own affairs, and to arrange them in such a manner as his own will may dictate. Where this arrangement is made under the fair exercise of judgment, without imposition, and with a requisite knowledge of the subject, it is certainly conclusive, unless the arrangement be in its nature alterable at the will of the person who has made it. It is a necessary consequence of this right, that an individual who has settled his accounts with another, and arranged the transactions between them, in a manner which receives the full and free assent of his mind, has a right to consider those transactions closed; and is consequently bound so to consider them. That

which might before have been a matter of controversy, is adjusted by mutual consent; and claims which might have been uncertain, are reduced to certainty. It is no objection to this adjustment, that some sacrifice may have been made. The party had a right to make the sacrifice. He had a right to balance in his own mind, the advantages of the settlement against its disadvantages; and if in his judgment the former preponderated, no other individual has a right to say that he was mistaken, and that, therefore, transactions which he had closed shall remain open. It follows, that an account settled between two individuals, each exercising his own free judgment on every part of it, is binding on both, as to all the items of that account. Mistakes may be corrected, omissions may be supplied, impositions may be relieved against, but a principle, understood, considered, and agreed upon, by a party in a situation fairly to exercise his own judgment, and to act in conformity with that judgment, must bind himself and his representatives, in, and out of court. To controvert these principles, would be to question the right of a man of full age and sound mind, to manage his own property, and to insist on transferring that right to another. That Mr. Brydie was capable of acting for himself, that he had a full knowledge of the subject, into the adjustment of which he entered, that his judgment was exercised free from undue influence of any kind, is not denied, certainly is not disproved. It is said, that his health was too delicate for laborious research or execution. Should this be admitted, he had clerks to perform what was too toilsome for himself, and the subject to be settled had long been familiar to him. In such a case, it surely must be necessary to show, that items have been introduced, which were not understood, before his own settlement shall be subverted.

Great errors are alleged to exist in the settlement. Errors so great and so manifest, that the court ought to correct them. An inquiry into this allegation, will now be made. The first error alleged is, in the premiums of insurance. M'Clure, Brydie & Co., directed the tobacco to be insured at a specified price, and Miller, Hart & Co. insured that tobacco at a higher price. Miller, Hart & Co. held three-fourths of the interest of M'Clure, Brydie & Co., and insist that, under the terms of the co-partnership, they had a right to insure upon the principles upon which they acted. To simplify the question, I will suppose Miller, Hart & Co. to have misconstrued articles, and that the point, if depending on them alone, would be decided in favour of the plaintiff. It remains to inquire, whether Brydie has not completely sanctioned this act. Accounts of sales, exhibiting the premiums paid for insurance, were regularly received. Of consequence, their conduct, on this subject, was

---

[2] As to the mode of proceeding in Virginia, against a non-resident debtor, having effects within the commonwealth. see Tate's Dig. pp. 32–34, tit. "Attachments," and the notes.

[3] See judicial act of 1789, § 12 (Story's Laws, pp. 57, 58 [1 Stat. 79]).

completely understood by Mr. Brydie. It does not appear, nor is it alleged, that he ever expressed any dissatisfaction at this proceeding. On the contrary, by receiving these accounts, and entering the balances without objection, he tacitly and impliedly sanctioned the principle on which Miller, Hart & Co. had acted. It gave them his authority to proceed in the same line of conduct. Had the case stopped here, it would have been going very far to say, that Mr. Brydie might, after the business was closed, charge Miller, Hart & Co. with the extra premium they had paid for insurance, under the impression, very justifiably entertained, that he approved their conduct. But the case does not stop here. A full settlement afterwards takes place, and Mr. Brydie, with a full knowledge of the fact, admits this item of charge. To controvert it now, unless it could be proved that some imposition was practised on him, would be to deny the right of an intelligent merchant to settle and close any one of his accounts. I do not mention the circumstance of Mr. Brydie's taking credit for this extra insurance in the cases of lost and damaged cargoes, because there may be some question about the fact, and because I do not think the case requires the aid of that fact. To afford a pretext for revising this item, it ought to be shown, that some imposition was practised on Mr. Brydie. For this purpose, it is alleged in the bill, that Miller, Hart & Co. did not pay these premiums in reality, but stood insurers themselves. This allegation is totally unsupported, and is positively denied, in the answer. It is therefore to be considered as untrue.

But the plaintiff requires, that authenticated copies of all the policies of insurance should be transmitted to this country. The defendants refuse to accede to this demand, and declare their readiness to exhibit the policies to any person whom the plaintiff may employ, to inspect them. The policies are said to be so numerous, as to form too bulky a package, to be sent without necessity. They transmit copies of the particular policies, specifically required by the plaintiff. Had this account never been settled, or was any circumstance in proof which might give countenance to the allegation of fraud, made in the bill, the court would not hastily overrule the demand for the production of the policies. But the account has been settled. Mr. Brydie has been satisfied that these premiums have been actually paid, and there is no single circumstance in the case to warrant the suspicion which has been expressed. The demand, then, that authentic copies of the policies should be transmitted to this country, is most unreasonable. It is founded on nothing which has a semblance of right. If this subject could be closed now, I should feel no difficulty on this part of the case. But as an account is to be taken, I shall leave the plaintiffs at liberty to demand a view of the policies in London.

The second error to be corrected, is the item of £3. 3s. on each hogshead, of a cargo sold to Holder for risk of damage on the tobacco. The reasoning applied to the preceding claim applies to this, and need not be repeated. It is apparent on the face of the account of sales, and was, consequently, understood by Mr. Brydie. But it is contended, that this was not a conclusive statement. It was a conjectural allowance dependant on a subsequent statement. This allegation is not supported, and there is no reason to believe it correct. Had this been the fact, Mr. Brydie would have required evidence of the actual damage on the final settlement of the account. His settling the account without charging this item, is proof that he considered the arrangement as having been definitely made with Holder, and was satisfied with it. If in this he was deceived, the deposition of Holder ought to have been taken by the plaintiffs, in order to prove the fact.

The third error, a correction of which has been required, is an extra charge of commissions and of interest. In the articles of copartnership, Miller, Hart & Co. stipulate to do the business in London on the same terms on which they had done the business for Alexander Brydie & Co. Consequently, they were bound to be content with the same commissions, and to keep an interest account on the same principles. The bill charges a departure from this stipulation. This allegation, also, is in express and unequivocal terms denied in the answer. Alexander Brydie was the acting partner, in this country, of Alexander Brydie & Co., and of McClure, Brydie & Co. Consequently, he understood perfectly the commissions charged by Miller, Hart & Co. to each of these firms. He never complained of their commissions, but impliedly approved them; first, by admitting the accounts, and afterwards, by making a final settlement, which acknowledged their correctness. The plaintiff does not pretend to show, that the commissions charged M'Clure, Brydie & Co. vary from those charged Alexander Brydie & Co., but shows, that different commissions have been charged M'Clure, Brydie & Co. for different cargoes, sold at different places, and under different circumstances, with all of which Alexander Brydie was perfectly satisfied. The interest account is not so clear, and I do not so well understand it. If the plaintiff can show a positive error in it, I shall permit him to do so. But the whole weight of proof lies with him.

A fourth error charged against Miller, Hart & Co. is, premiums paid for insurance against fire. But this item is in express terms allowed by Brydie, and was afterwards admitted by him in the settlement.

A fifth error is, an allowance of 10s. per cwt., on 400 hogsheads of tobacco purchased for Keymer, M'Taggert & Co. at £3 per cwt.

Keymer, M'Taggert & Co. alleged, that their orders had been disobeyed, and refused to receive this tobacco. Miller, Hart & Co. made a compromise, and agreed to receive 50s. instead of 60s. per cwt. Alexander Brydie says, he does not think they were bound to make this concession, but believing they acted for the best, he acquiesces in it, and will cheerfully bear his proportion of the loss. Alexander Brydie might certainly have refused to accede to this compromise, in which case, Miller, Hart & Co. would have stood in the place of Keymer, M'Taggert & Co., and must have paid whatever sum that company was liable for. But although Alexander Brydie might have withheld his assent, he was not bound to withhold it. He was at liberty to accept or reject the compromise. With a full knowledge of the subject, he chose to accept it. Who shall reverse his decision, and say, that against his will, he shall go on with the contest, and risk almost the whole cargo, on the liability of Keymer, M'Taggert & Co., to pay 60s. per hundred for the tobacco? It is alleged, that this compromise was not actually made; but this allegation is not supported by even the semblance of probability, and if the plaintiffs rely on it, they ought to have taken the testimony which was in their power, to establish the fact.

A sixth error, is a credit taken in the books, for £1,800, a variance between the London and Virginia books. This allegation is expressly denied in the answer, and is not proved. I understand the answer, as accounting for the alleged error of £2,000, in favour of M'Clure. In objection to the account which was settled, it is alleged, that M'Clure signed it for himself only, not for his partners. That Miller and Hart were not bound, and, therefore, Brydie ought not to be bound. Whenever Miller and Hart signified their acquiescence in this account, it became obligatory on them, even supposing that their silence did not render it obligatory. But whatever force might arise from this circumstance, if Miller and Hart had never signified their acquiescence in the settlement, and Brydie had alleged this fact, and brought a bill on that account, to have a resettlement, it can have no force when Miller and Hart appear to have approved the settlement, and are not put upon the proof of that fact, by the allegation that they had not assented to it. It has been also contended, that Miller, Hart & Co. ought to have set forth the settled account, if they relied upon it, as a bar to the re-settlement which is demanded in the bill. If this bill had been brought for a settlement of accounts, without admitting a former settlement, this observation would be correct. The defendant ought not to be, and most certainly would not be, admitted to plead a former settlement in bar, without showing that former settlement. But this bill admits a former settlement, which must be in possession of the plaintiffs. It is therefore not essential, that the defendants should exhibit it, nor have they ever been required to exhibit it. The original has been produced and read in court. That it cannot longer be produced, is not the fault of either party; each party is, I presume, possessed of copies. If, on this part of the case, any difficulty should arise, the court will interfere so far as may be necessary.

The errors alleged in the former settlement have been considered. If there was nothing further in the case, I could not hesitate to dismiss the bill. But the parties agree that some accounts between them still remain open. Of these, an account is, of course, to be taken. If, during the pendency of this account, the plaintiff chooses to inspect the policies in London, he is at liberty to do so, and if there is any one case, in which Miller, Hart & Co. have themselves stood insurers, he is at liberty to bring the circumstances of that case before the court. He may also take depositions, to show any imposition on Alexander Brydie, and he may show to the commissioner, any positive error in the interest account, but he is not at liberty to open the settlement on any point agreed to by Alexander Brydie, unless he can prove fraud or misrepresentation in obtaining that agreement.